UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | |
|---|---|
| FRANKLIN G. ENDICOTT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 2:14 CV 107 DDN |
| | ) |
| JAMES HURLEY, LARRY ALLEN, | ) |
| PASCHA ALLEN, RICHARD S. | ) |
| GRIGGS, WILLIAM JONES, | ) |
| CHANTAY GODERT, ALAN EARLS, | ) |
| JOYCE EDWARDS, TYREE BUTLER, | ) |
| JAMES RHODES, JACOB BAKER, | ) |
| THOMAS CABRERA, M.D., CORIZON | ) |
| HEALTH, INC., LISA RUBY, | ) |
| GEORGE A. LOMBARDI, CAPTAIN | ) |
| CALVIN, CO I REID, CO I AVERY, | ) |
| LT. CUTT, KRISTEN CUTT, ROSCHELL | ) |
| DAVIS, CORIZON, L.L.C. | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM AND ORDER REGARDING CLAIM ORGANIZATION**

This action is before the court on the motion of defendants Larry Allen, Jacob Baker, Tyree Butler, Alan Earls, Joyce Edwards, Chantay Godert, Richard Griggs, James Hurley, William Jones, George Lombardi, James Rhodes, and Lisa Ruby to dismiss plaintiff's claims under Federal Rule of Civil Procedure 21. (Doc. 53, 56.)[1] The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 26.) Defendants filed a motion to sever parties and claims on December 7, 2015, and amended that motion on December 8, 2015. (Docs. 53, 56.) Plaintiff replied to defendants' motion on December 30, 2015

---

[1] Document 56 is an amended motion to partially dismiss. The only difference between the two documents is that Document 56 added defendants Reed and Calvin. (Doc. 56 at 1.)

(Doc. 71) and defendants responded to that reply on January 6, 2016. (Doc. 73). The court heard oral argument on January 21, 2016.

## I. BACKGROUND

On December 11, 2014, plaintiff commenced this action, pro se, against defendants and he was granted in forma pauperis status. (Docs. 1, 2.) An order of partial dismissal without prejudice was entered for several defendants. (Doc. 6.) Plaintiff filed two amended complaints pro se. (Docs. 14, 43.) Plaintiff was appointed counsel on May 19, 2015, and the court granted counsel time and leave to file a third amended complaint. (Doc. 39, 40.) Counsel filed a third amended complaint on October 7, 2015. (Doc. 49.) According to plaintiff's allegations the following occurred.

Plaintiff is currently incarcerated at Northeast Correctional Center (N.E.C.C.) in Bowling Green, Missouri. (Doc. 47-1 ¶ 1.) All defendants except Dr. Cabrera, M.D., Pascha Allen, LPN, Corizon Health Inc., and Corizon, LLC[2] are or were employed by N.E.C.C. (Id. at ¶¶ 2–23.)

**Varicose Veins and Ischemic Attacks**

Plaintiff was diagnosed by Dr. Victor Phillips, M.D., with symptomatic varicose veins in his right leg on or about July 2010. He ordered an ultrasound and wrote a pain prescription for Valium and numbing gel. Corizon employees made no effort to supply plaintiff with the prescribed medication or an alternative, because schedule II narcotics could not be provided to plaintiff. (Id. ¶¶ 29–32.) On or about September 17, 2010, plaintiff requested medical services because his calf had become swollen, hardened, red, warm, and painful. Dr. Cabrera noted that vein ablation had been approved by Dr. Phillips, but an ultrasound was needed and, therefore, Dr. Cabrera approved one. (Id. ¶¶ 33–34.)

---

[2] Plaintiff alleges that Corizon Health, Inc. and Corizon, L.L.C. are legally related entities. (Doc. 47-1 ¶¶ 23–24.) The court will refer to both entities simply as "Corizon".

On September 20, 2010, plaintiff was seen at sick call and diagnosed with phlebitis, inflammation of a vein, and ordered to rest and ice the area and given aspirin. An ultrasound was never performed. (Id. ¶¶ 35–36.) On or about September 29, 2010, plaintiff was admitted to the Audrain Medical Center where an ultrasound was performed showing a clot in his vein above his right ankle. Dr. Phillips prescribed pre-operative medication for plaintiff. Corizon employees made no effort to provide these medications to plaintiff before the procedure. On or about October 1, 2010, plaintiff underwent partial vein ablation at Dr. Phillips' office in Jefferson City, Missouri. The procedure was more painful and stressful than it would have been had plaintiff been given the prescribed medication. Due in part to these factors the procedure was not completed on October 1, 2010 and a follow-up procedure was scheduled for October 15, 2010. (Id. ¶¶ 37-39.)

Prior to the October 15, 2010 appointment no employee at Corizon made any effort to arrange for the pre-operative medication to be supplied to plaintiff. Therefore, Corizon and its employees knowingly sent plaintiff to the appointment without the required medication being given. Furthermore, defendants Avery and Reid caused plaintiff to be late to the procedure resulting in the rescheduling of it to November 5, 2010. (Id. ¶¶ 42–43.)

On October 21, 2010, plaintiff went to the infirmary with a self-reported emergency because his left hand was tingling and his fingers and face were becoming numb. Plaintiff informed Nurse Linda Wiley, L.P.N., an employee of Corizon, of the left leg blood clot. Nurse Wiley assessed the situation as "non-emergent, but urgent" and told him to come back at sick call. On October 22, 2010, plaintiff appeared at sick call and saw Nurse Wiley again. He informed her that he had numbness from the top upper left side of his lip and his left upper arm down to his fifth digit the night before. He complained of dizziness and a headache during the event. Nurse Wiley referred him to Chronic Care, but did not consult a physician, order any tests, or take any action to rule out complications or conditions related to his lower extremity blood clot. (Id. ¶¶ 44–45.)

On November 3, 2010, plaintiff again saw Nurse Wiley. He reported another episode the night before which worried him that he was having stroke-like symptoms.

He had not seen a physician even though he had reported the same symptoms on October 21, 2010. Corizon made no other efforts to rule out a stroke, transient ischemic attack, or other complications due to the known blood clot in his left leg. (Id. ¶¶ 47.)

On November 5, 2010, Dr. Phillips recommended an ultrasound on his leg as follow-up to the vein ablation as well as a carotid Doppler due to the transient ischemic attacks. On November 8, 2010, Dr. Cabrera reviewed the recommendation and referred it to "RMD" for follow-up, and it was approved on or about the same day. The carotid Doppler was not scheduled until November 18, 2010 and the follow-up ultrasound was delayed until December 2, 2012. This was due to an alleged error in obtaining a referral. (Id. ¶¶ 48–49.)

**Fractured Leg**

On January 11, 2014, plaintiff injured his right ankle. He was sent via ambulance to Hannibal Regional Hospital's Emergency Department (ED). He was diagnosed with an avulsion fracture of his right ankle and received discharge instructions to follow-up with Dr. Curtis Burton, M.D., an orthopedic specialist in five days. On January 11, 2014, plaintiff returned to N.E.C.C. and Nurse Allen saw him and stated plaintiff was to follow-up with Dr. Cabrera, not Dr. Burton, in ten days, not five, even though she noted that the hospital said to follow-up in five days with Dr. Burton. Dr. Cabrera is not an orthopedist. Dr. Archer provided defendant tramadol and Ibuprofen for his pain, but did not order a follow-up with either Dr. Cabrera or Dr. Burton. Nurse Allen failed to provide Dr. Archer with the ED report, even after Dr. Archer requested it. Nurse Allen then failed to provide the ED report to Dr. Cabrera even though she told Dr. Archer she would. This delay caused plaintiff to not receive timely treatment for his right ankle fracture, which increased his risk for complications due to his pre-existing medical conditions. (Id. ¶¶ 51–54.)

On January 21, 2014, Dr. Archer saw plaintiff for a follow-up on his ankle and medication refill. Dr. Archer referred plaintiff to an orthopedic specialist. On January 29, 2014, plaintiff saw Dr. Galbraith, M.D., an orthopedic specialist, via teleconference

and was prescribed a boot cast. This cast was to be shipped next-day express. On February 4, 2014, plaintiff went to sick call to inquire about his prescribed boot cast. Nurse Allen stated she knew something about a boot cast. The x-ray technician fitted the boot and gave it to plaintiff to wear. On March 5, 2014, Dr. Galbraith ordered plaintiff to remain in the boot cast for two weeks and then to wean out of the boot cast. On March 19, 2014, the boot cast was taken away from plaintiff with no time to strengthen his leg and wean out of the boot cast. (Id. ¶¶ 55–59.)

**Prostate Medication**

Corizon is responsible for scheduling recommended lab work and physician visits. Nurse Allen, as the chronic care nurse, should be in charge of this procedure. On August 1, 2014, without seeing plaintiff, Dr. Cabrera renewed plaintiff's medications and changed his prostate medication. Missouri Revised Statute 334.100.2(4) prohibits a doctor from prescribing medication without seeing the patient. On September 5, 2014, plaintiff reported to Nurse Wiley regarding his difficulty urinating and the change in his prostate medication. Nurse Wiley stated she would inform Nurse Allen. Neither nurse reported plaintiff's condition to a physician or scheduled plaintiff for a physician visit. (Id. ¶¶ 60–63.)

On September 20, 2014, plaintiff saw Dr. Glen Babich, M.D., for a cardiology appointment and informed him that his prostate medication was changed. His prostate medication was returned to the original one  Plaintiff could not resume the original prostate medication for ten days, and therefore, his prostate continued to swell resulting in difficulty urinating, a painful bladder, lack of sleep, emotional stress, and irritability. (Id. ¶¶ 64–65.)

Corizon changed its policies so that formula medications could not be prescribed for inmates. Plaintiff's original prostate medication is a formula medication. Corizon changed plaintiff's medication without regard to whether it would be effective and without regard to the fact that plaintiff's original medication was working to alleviate his condition. (Id. ¶¶ 66–68.)

**Prison Policy Relating to Time Transfer to Sick Call**

Corizon has a policy of allowing inmates 15 minutes to move from their housing unit to sick call in order to turn in their Medical Request form. N.E.C.C. Warden James Hurley limited this movement to only 10 minutes. Due to this limited time frame and the difficulty of movement in a prison environment, plaintiff was not seen on August 29, 2014. CO I Lisa Ruby prevented plaintiff from reaching sick call within Corizon's 15 minute time limit by enforcing defendant Hurley's 10 minute time limit. Plaintiff, therefore, continued to suffer the effects of the wrong prostate medication resulting in difficulty urinating, pain, and discomfort. (Id. ¶¶ 69–73.)

Director of Missouri Corrections, George Lombardi, has a duty to ensure inmates have access to health care services. By allowing Warden Hurley to enforce a 10 minute movement limit, Lombardi is preventing prisoners, including plaintiff, from accessing health care. (Id. ¶¶ 74–76.)

**Knowledge of Rocschell Davis**

Plaintiff has filed multiple Informal Resolution Requests (IRR) since September 2010 in order to allege deliberate indifference to his medical needs by Nurse Allen. Health Services Administrator Davis participated in the review of and response to some of the IRRs, but little to no change has been made regarding Nurse Allen's care of plaintiff. Davis knew or should have known of the deliberate indifference of Corizon and its employees to the medical needs of plaintiff. (Id. ¶¶ 77–79.)

**Transfer to Administrative Segregation**

On or about March 19, 2014, a note was placed in Nurse Allen's file informing her not to delay or deny plaintiff's access to medical care. Plaintiff was transferred to administrative segregation for unspecified "gang activity" on or about March 19, 2014, at the insistence of Lt. Larry Allen. Other correctional officers objected to this classification. Lt. Larry Allen is married to Nurse Pascha Allen. During the transfer of

plaintiff to administrative segregation Lt. Allen treated him in an intimidating manner and arranged for his wife, Nurse Allen, to perform a vital signs check before plaintiff was placed in administrative segregation. (Id. ¶¶ 80–84.)

Before being placed in administrative segregation plaintiff was on honor status. Upon placement in administrative segregation his honor status was revoked and all privileges were rescinded. Additionally, while in administrative segregation plaintiff was unable to perform appropriate physical therapy on his ankle. (Id. ¶¶ 86–89.)

**Denial of a Meaningful Hearing Regarding Administrative Segregation Placement**

According to Missouri Revised Statute 217.375.1 a prisoner is entitled to a hearing within five days of being placed in administrative segregation. Functional Unit Manager Tyree Butler refused to schedule plaintiff a hearing until March 28, 2014, nine days after being placed in administrative segregation. Plaintiff was informed that there was an ongoing investigation of him by Investigator James Rhodes. Furthermore, plaintiff was informed that he was not entitled to a hearing because he was not placed in administrative segregation for a conduct violation. Plaintiff was informed on March 28, 2014, May 23, 2014, June 30, 2014, and July 18, 2014, at his periodic segregation reviews, that he would remain in administrative segregation until Investigator Rhodes' investigation was finished. Lt. Kristen Cutt and Functional Unit Manager Butler participated in these review hearings. Deputy Warden Jones, Assistant Warden Griggs, Assistant Warden Godert, and Warden Hurley had to approve his extended segregation. Plaintiff was not removed from administrative segregation until August 1, 2014. (Id. ¶¶ 90–99.)

**Failure to have Policies Defining "Gang", "Gang Member", or "Gang Activity"**

Plaintiff was not, upon his release from administrative segregation, provided the reasons for his administrative segregation. He did not know what rule he violated or how to avoid violation in the future. He was never provided a definition of "gang activity" or "gang affiliation". (Id.¶¶ 100.)

Director Lombardi, Warden Hurley, Deputy Division Director Earls, and other MDOC personnel have no definition of "gang affiliation" or "gang activity". Also there is no policy requiring a clear statement of what conduct or rule violation is the basis for an investigation. MDOC does not provide an explanation of how someone is an ongoing risk to the safety and security of the institution. This creates an environment where someone can be held in administrative segregation in "pending investigation" status for significant amounts of time. (Id. ¶ 101.)

**Failure to Provide Findings and Conclusions of the Investigation**

Investigator Rhodes never provided plaintiff a summary of the investigation and whether plaintiff was found to be a gang member or involved in gang activity. Deputy Division Director Alan Earls, Warden James Hurley are required to keep records of administrative segregation pursuant to Missouri Revised Statute 217.375.2. (Id. ¶¶ 103–04.)

**Steel Grate on Administrative Segregation Cells Doors and Forced Cell Sharing with Known "Gang Members"**

Administrative cell doors are solid steel with a solid glass window. Each steel door has eleven steel pieces wielded to the inside of the door at chest level at a horizontal angle allowing for severe injury to inmates. Warded Hurly, Deputy Director Earls, and Director Lombardi allowed for these steel slates to be placed inside the cells. There appears to be no penological purpose to the steel plates inside the cell. (Id. ¶¶ 106–08.)

Prisoners housed in administrative segregation are double celled with anyone not on their list of known enemies. At least three declared gang members refused to be housed with plaintiff, and plaintiff refused to be housed with any known gang member. Plaintiff was housed in a single cell and then with a non-gang member for a least a portion of his time in administrative segregation. (Id. ¶¶ 109–13.)

On July 13, 2014, CO II Jacob Baker ordered plaintiff shackled and cuffed on a steel bench until he agreed to be double celled. Plaintiff agreed to a double cell if he

would not be placed with a gang member.  Plaintiff was placed with a gang member of a prison gang known to assault sex offenders, which the plaintiff is.  CO II Baker knew plaintiff was a convicted sex offender and that the other prisoner was a member of a prison gang known for assaulting sex offenders.  (Id. ¶¶ 110–18.)

**Failure to Obtain Enemy Waiver**

Policies and procedures at N.E.C.C. require that if two inmates are enemies then each must sign a waiver before being placed back into general population.  If one refuses, one must be moved to a different prison.  Functional Unit Manager Tyree Butler, the head of classification at N.E.C.C., failed to obtain an enemy waiver from plaintiff for each prisoner who declared him to be an enemy before releasing him back into general population in August 2014.  (Id. ¶¶ 119–20.)

**Denial of Access to Law Library**

While plaintiff was in administrative segregation from March 19, 2014 to August 1, 2014, he was denied access to the prison law library and law clerk assistance by librarian Joyce Edwards, Assistant Warden Griggs, CO William Jones, and Warden Hurley.  Plaintiff was in the process of appealing his conviction in state court and preparing the lawsuit at issue here.  Plaintiff submitted multiple special unit legal request forms, which are required for inmates in administrative segregation to access case law and law clerk assistance.  Plaintiff's forms were denied by defendant Edwards, stating plaintiff would not gain access if he did not pay using his private funds as plaintiff did not have a qualified legal claim form.  Plaintiff's request for assistance from the law clerk was not responded to by defendant Edwards.  Assistant Warden Griggs responded to plaintiff's request by either saying a qualified legal claim verification was not required or that plaintiff could not access law materials as there was no court deadline to prepare for.  Plaintiff filed an IRR regarding the denials.  (Id. ¶¶ 123–29.)

On July 23, 2014, Lt. Kristin Cutt, Functional Unit Manager Butler, and Assistant Warden Griggs denied plaintiff's IRR and stated he needed an approved qualified legal

claim verification for such access. Plaintiff appealed and defendant Earls denied the appeal. Other similarly situated prisoners were given access to the law library and offender law clerks. Due to this denial plaintiff was prevented from preparing and providing motions and research to his then attorney Larry Fleming. (Id. ¶¶ 129–34.)

Upon release from administrative segregation, plaintiff's access to the law library continued to be restricted. Assistant Warden Griggs had plaintiff report to mandatory work detail during free time which plaintiff could have used in the law library. Assistant Warden Griggs also sent plaintiff's qualified legal claim form back to plaintiff's case worker for verification of which days of the week plaintiff would be using the law library. Assistant Warden Griggs has not delayed another prisoner's request in this way. (Id. ¶¶ 135–37.)

**Night Time Visit for Blood Pressure Check**

Nurse Allen scheduled plaintiff for a blood pressure check at 9:15 p.m. on November 11, 2014. No other inmates were present in the medical unit at this time. Blood pressure checks are not normally conducted at this time. The medical unit is one of the only places in N.E.C.C. not covered by cameras. Lt. Allen and several other officers were in the medical unit when plaintiff reported. Nurse Allen did not take his blood pressure for at least twenty minutes. Plaintiff was left alone with Lt. Allen, the medical officer, and several other officers. Once plaintiff's blood pressure was taken he was held in the medical unit until he specifically asked for a pass back to his housing unit. (Id. ¶¶ 138–42.)

**Allegations and Relief Sought**

In Count 1 plaintiff alleges a deliberate indifference to his serious medical needs (varicose veins, transient ischemic attacks, fractured foot, and prostate medication) by Corizon, defendant Nurse Allen, and defendant Dr. Cabrera. (Id. ¶¶ 146–58.)

In Count 2 plaintiff alleges a deliberate indifference to his serious medical needs by the change in his prostate medication against Corizon and defendant Dr. Cabrera. (Id. ¶¶ 159–67.)

In Count 3 plaintiff alleges a deliberate indifference to his serious medical needs by defendants Hurley and Ruby for the deliberate prevention of plaintiff from being seen at sick call due to N.E.C.C. policies. (Id. ¶¶ 168–80.)

In Count 4 plaintiff alleges a deliberate indifference to a serious medical need by defendants Calvin, D. Cutt, Reid, and Avery when they delayed his transfer for surgery on October 15, 2010. (Id. ¶¶ 181–91.)

In Count 5 plaintiff alleges retaliation by defendant L. Allen and defendant P. Allen when they falsely identified plaintiff as a gang member and had him placed in administrative segregation in violation of his First Amendment right to file complaints free from coercion or threats by N.E.C.C., prison employees, Corizon, as well as Corizon employees. (Id. ¶¶ 193–98.)

In Count 6 plaintiff alleges retaliation against him in violation of his First Amendment right to seek redress by defendants Hurley, Griggs, Jones, Godert, Rhodes, Cutt, and Butler when they put him in administrative segregation and failed to provide a timely hearing or identify the charges against him. (Id. ¶¶ 202–05.)

In Count 7 plaintiff alleges retaliation against him by defendants Lombardi, Earls, L. Allen, Hurley, Griggs, Jones, Godert, Rhodes, Butler, Baker, and Cutt for placing him in an administrative segregation cell which has steel grates with sharp points on the inside of the door which may cause serious injury. (Id. ¶¶ 210–13.)

In Count 8 plaintiff alleges retaliation in violation of his First Amendment right by defendants Baker and Cutt when they placed him in an administrative segregation cell with known gang members. (Id. ¶¶ 218–21.)

In Count 9 plaintiff alleges retaliation by defendants Hurley, Griggs, Jones, Earls, Butler, Cutt, and Edwards when they denied him access to the law library while he was administrative segregation. (Id. ¶¶ 226–29.)

In Count 10 plaintiff alleges that defendants Hurley, Davis, Griggs, Jones, Godert, Earls, and Lombardi tacitly authorized the deliberate indifference to the medical needs of plaintiff by knowing of the problems Corizon and its employees were causing, but never taking any action to address the problems in violation of plaintiff's Eighth Amendment rights. (Id. ¶¶ 234–38.)

In Count 11 plaintiff alleges that defendants Hurley, Davis, Griggs, Jones, Godert, Earles, and Lombardi tacitly authorized the retaliation against plaintiff by N.E.C.C. and Corizon for his exercising of his First amendment right to redress in violation of his Eighth Amendment rights. (Id. ¶¶ 242–45.)

In Count 12 plaintiff alleges that defendants Lombardi, Earls, L. Allen, Hurley, Griggs, Jones, Godert, Rhodes, Butler, Baker, and D. Cutt violated his Eighth Amendment rights by placing him in a administrative segregation cell which has steel grates with sharp edges welded to the inside. These grates could cause a high risk of injury to plaintiff resulting in cruel and unusual punishment (Id. ¶¶ 250–59.)

In Count 13 plaintiff alleges that defendants Lombardi, Earls, Hurley Griggs, Jones, Godert, and Butler violated his right to due process and equal protection by not implementing policies at N.E.C.C. defining "gang," "gang member," or "gang activity." (Id. ¶¶ 263–68.)

In Count 14 plaintiff alleges that defendants Hurley, Earls, and Butler violated his right to due process and equal protection by failing to follow N.E.C.C. policies regarding the release of declared enemies from administrative segregation into general population without a waiver. (Id. ¶¶ 272–76.)

In Count 15 plaintiff alleges that defendants L. Allen and P. Allen conspired together to violate his right to due process, equal protection, and access to medical care in retaliation for plaintiff's complaints against defendant P. Allen and others at N.E.C.C. This conspiracy resulted in plaintiff being labeled a gang member, moved to administrative segregation, and stripped of his honor status. (Id. ¶¶ 280–82.)

Plaintiff seeks significant actual damages for the injuries caused; significant punitive damages to deter any future such action; and reasonable attorneys' fees and costs. (Id. at 29–55.)

## II.  GROUPING OF CLAIMS

Defendants represented by the Missouri Attorney General's office seek partial dismissal of claims and defendants under Federal Rule of Civil Procedure 21. Rule 21 allows the court to sever or drop a claim if misjoined under Rule 20. Rule 20 provides that more than one defendant may be joined in one action, if any similar claim is asserted against the defendants or if the claims against them arise from the same transaction, occurrence, or series of transactions or occurrences, and there is a question of law or fact that is common to all the claim against all the defendants. F. R. Civ. P. 20(a)(2). Plaintiff argues that all of his claims are bound together by a continuing pattern of deprivation of his constitutional rights by the defendants which is reflected in his Count 15 claim.

Defendants' motions do not test the legal or factual sufficiency of plaintiff's claims, but whether they should be joined or severed. The court concludes that justice can be best served by the organization of plaintiff's claim into groups that are efficiently litigated. Federal Rule of Civil Procedure 42(b) allows the court broad discretion to separate claims into litigable groups "[f]or convenience, to avoid prejudice, or to expedite and economize . . . ." F. R. Civ. P. 42(b); cf. Rikard v. U.S. Auto. Prot., LLC, No. 4:11 CV 1580 JCH, 2013 WL 5538726, at *2 (E.D. Mo. Oct. 8, 2013).

All claims involve overlapping questions of fact as well as many of the same defendants. To partially dismiss some claims, forcing plaintiff to refile at least two other complaints, would be a waste of judicial and party resources with extended discovery as well as duplicitous pre-trial motion practice. See Evantigroup, LLC v. Mangia Mobile, LLC, No. 4:11 CV 1328 CEJ, 2014 WL 1048589, at *1 (E.D. Mo. Mar. 14, 2014). Furthermore, the court has appointed counsel for plaintiff and to separate these actions into entirely different complaints could make it prohibitively expensive for counsel as

well as plaintiff.  See Reznik v. HMSHost Corp., No. 4:15 CV 648 CAS, 2016 WL 233242, at * 4 (E.D. Mo. Jan. 20, 2016) (joinder allowed for economically disadvantaged plaintiffs to hire one counsel and save filing fees, attorneys' fees, discovery and mediation costs, etc.).  However, to litigate all claims in one trial or other proceeding will unnecessarily burden the parties and possibly confuse a jury.

The court has considered each of plaintiff's fifteen claims and has determined that the following two groups of claims are best separated for separate consideration.  By organizing the claims into these groups the court has not concluded that each or any claim or count is legally or factually sufficient on its face.

### III.  CLAIM ORGANIZATION

For the reasons set forth above,

**IT IS HEREBY ORDERED** that the motions of certain defendants to dismiss or for other relief (Docs. 53, 56) are sustained, in that the following groups of claims are separated for separate disposition:

Claim Group 1:  Counts 1, 2, 3, 4, 10, 11, and 15; and

Claim Group 2:  Counts 5, 6, 7, 8, 9, 12, 13, and 14.

In all other respects, the motions are denied.

**IT IS FURTHER ORDERED** that counsel for all parties confer and propose a schedule whereby the parties, regarding Group 1, close discovery not later than April 30, 2016, and file motions for summary judgment on the Group 1 counts not later than June 30, 2016.  A hearing on any such motion for summary judgment is set for July 15, 2016 at 10:00 a.m.

/S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on February 1, 2016.