**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**NORTHERN DIVISION**

FRANKLIN ENDICOTT,                  )
                                    )
        Plaintiff,                  )
                                    )
v.                                  )       Cause No. 2:14-cv-00107-DDN
                                    )
JAMES HURLEY, et. al.,              )
                                    )
        Defendants.                 )

## CORIZON DEFENDANTS[1] MEORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

---

[1] Defendants Tomas Cabrera (a physician, and hereinafter "Dr. Cabrera"), Pascha Allen (a licensed practical nurse, and hereinafter "Nurse Allen"), Roschell Davis Norton (a registered nurse, and hereinafter "Nurse Norton"), and Corizon, LLC, and Corizon Health, Inc. (both collectively referred to herein as "Corizon").

## Table of Contents

Table of Authorities ..........................................................................................................4

Facts ...................................................................................................................................6

    2010 Events ..................................................................................................................7

        Varicose Veins, TIAs, and Blood Clot.................................................................7

        IRR 10-1786 Filed by Plaintiff............................................................................9

    2014 Events ..................................................................................................................9

        Fractured Left Ankle .............................................................................................9

        Placement of Plaintiff in Ad-Seg.......................................................................10

        Change in Prostate Medication..........................................................................11

        "Late-Night" Blood Pressure Check ..................................................................12

        IRR 14-136 Filed by Plaintiff............................................................................12

Standard of Review............................................................................................................13

Citation of Authority in Support of Arguments................................................................14

Argument – Nurse Allen....................................................................................................16

    Ablation Procedure.....................................................................................................17

    "Life-Threatening" Blood Clot ..................................................................................18

    Purported TIAs...........................................................................................................18

    Fractured Ankle..........................................................................................................19

    Prostate Medication....................................................................................................21

2

Conspiracy and Retaliation ...................................................................................22

Argument – Nurse Norton ......................................................................................24

Argument – Dr. Cabrera .........................................................................................25

   Treatment of Blood Clot .....................................................................................25

   Change of Prostate Medication ..........................................................................26

Argument - Corizon ...............................................................................................27

   Unconstitutional Policies....................................................................................27

   Injunctive Relief.................................................................................................28

Conclusion ............................................................................................................28

## Table of Authorities

### Cases

*Adam-Mellang v. Apt. Search, Inc.*, 96 F.3d 297 (8th Cir. 1996) .................................................16

*Baribeau v. City of Minneapolis*, 596 F.3d 465 (8th Cir. 2010) .......................................................16

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .................................................................................14

*Coleman v. Rahija*, 114 F.3d 778 (8th Cir. 1997) .............................................................................14

*Crowley v. Hedgepeth*, 109 F.3d 500 (8th Cir. 1997) .......................................................................15

*Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109 (8th Cir. 1981).................................................16

*Dulany v. Carnahan*, 132 F.3d 1234 (8th Cir. 1997)........................................................................15

*Estate of Rosenberg v. Crandell*, 56 F.3d 35 (8th Cir. 1995) ..........................................................14

*Estelle v. Gamble*, 429 U.S. 97 (1976) .............................................................................................14

*Harris v. Henneberry*, 2007 WL 4290739 (E.D. Mo. 2007) ............................................................16

*Kitchen v. Miller*, 343 F.Supp.2d 820 (E.D. Mo. 2004) ...................................................................14

*Long v. Nix*, 86 F.3d 761 (8th Cir. 1996)..........................................................................................15

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)......................................14

*McDowell v. Jones*, 990 F.2d 433 (8th Cir. 1993)............................................................................16

*Monroe v. Precythe*, 2020 WL 2322922 (E.D. Mo. 2020) ..............................................................15

*Revels v. Vincenz*, 382 F.3d 870 (8th Cir. 2004)..............................................................................15

*Toney v. Hakala*, 2013 WL 5406448 (E.D. Mo. 2013) ....................................................................15

*Watkins Inc. v. Lewis*, 346 F.3d 841 (8th Cir. 2003) .......................................................................16

*White v. Farrier*, 849 F.2d 322 (8th Cir. 1988) ...............................................................................15

## *United States Constitution*

Eighth Amendment ..................................................................................................................14

## *Statutes*

42 U.S.C. § 1983 ...................................................................................................................14

Section 334.100.2(4)(h) RSMo ..............................................................................................26

## *Rules*

Fed.R.Civ.P. 56(c) .................................................................................................................13

COME NOW Corizon Defendants, by and through counsel, and, for their Memorandum of Law in Support of Motion for Summary Judgment, state as follows:

## Facts

At all relevant times referenced in his Fifth Amended Complaint ("Complaint), from 2010 to 2014, Plaintiff was incarcerated within the Missouri Department of Corrections ("MDOC") and was confined to Northeast Correctional Center ("NECC"), and Corizon had a contract with the State of Missouri to provide medical services to offenders incarcerated within the MDOC.  (SOF[2] 1-3)  Also, at various times between 2010 and 2014, Corizon Defendants were employees of Corizon and assigned to NECC.  (SOF 8, 23, 28)

During the timeframe encompassing Plaintiff's Complaint, Nurse Allen was a chronic care nurse at NECC, which involved the treatment of chronic medical issues, including diabetes, cardiovascular issues, hypertension, and endocrine problems.  (SOF 9, 11, 13)  A chronic-care issue is a medical condition that "goes on for a long time," whereas a medical condition that "happened out of the blue" is an acute issue.  (SOF 10)  Occasionally, when needed, Nurse Allen would be assigned to a nonchronic-care related position.  (SOF 15)  Nurse Allen knew Plaintiff because he was treated for chronic care issues.  (SOF 17, 52)  She and Plaintiff have known each other since approximately 2001.  (SOF 83)

Nurse Norton has been employed by Corizon at various times, from December 29, 2004 to the present.  (SOF 23)  The only time that she was assigned to NECC was from February 3, 2012 to October 10, 2014, which included the position of Health Services Administrator ("HSA") until September 21, 2014.  (SOF 24-25)  As HSA, Nurse Norton's duties were

---

[2] "SOF" references statements of uncontroverted material facts in Corizon Defendants' Statement of Uncontroverted Material Facts in Support of Motion for Summary Judgment, filed simultaneously herewith.

administrative and included reviewing and investigating Offender Grievances.  (SOF 26)  Nurse

Norton was not involved in providing any medical treatment to Plaintiff.  (SOF 27)

Dr. Cabrera was assigned to NECC as the Medical Director, and his duties included

"checking and treating" offenders confined thereto.  (SOF 28, 29)  Plaintiff had been a patient of

Dr. Cabrera's for seven years.  (SOF 30)

With the exception of Nurse Norton, Dr. Cabrera  and Nurse Allen  provided medical

care and treatment to Plaintiff at various times between 2010 and 2014.  The allegations against

Corizon Defendants pertain to events occurring in 2010 and in 2014.

### 2010 Events

The allegations pertaining to events that occurred in 2010 involved: treatment of varicose

veins, purported transient ischemic attacks ("TIAs"), and a blood clot; and the filing of an

Informal Resolution Request[3] ("IRR").  (SOF 5, 63, 84)

### Varicose Veins, TIAs, and Blood Clot

Plaintiff had a history of large varicose veins on the back of his right calf for which he

received treatment from June 1 to December 8, 2010.  (SOF 32-33)  Per Dr. Cabrera's request of

July 12, 2010, Plaintiff was seen on July 30 for a consultation with Dr. Victor Phillips, a vascular

surgeon in Jefferson City, who recommended that Plaintiff undergo ablation[4] procedures of the

right greater saphenous vein and of the right lesser saphenous vein.  (SOF 34, 36)  The procedure

for the right saphenous vein was scheduled for October 1.  (SOF 45)

---

[3] Informal Resolution Request, the first step, per MDOC Offender Grievance procedure (D5-3.2), in the grievance process, in which the offender files a complaint related to conditions of confinement, including medical care.  Once an offender files an IRR, and if he is unsatisfied with the results, he may then file an Offender Grievance.  If the offender is not satisfied with the results of the Offender Grievance, he may then file an Offender Grievance Appeal, the final step in the grievance process.

[4] Radiofrequency ablation, a minimally invasive treatment for varicose veins.

On September 20, Plaintiff was seen by Dr. Cabrera for complaints of a red, hot knot on Plaintiff's posterior right thigh.  (SOF 64)  Dr. Cabrera diagnosed the knot as superficial phlebitis, a formation of clots in the superficial vein, and ordered that Plaintiff take aspirin, use ice as needed, rest and not work, and assignment to a bottom bunk.  (SOF 64-66)

Before the ablation procedure could take place on October 1, Dr. Phillips requested that Plaintiff first undergo an ultrasound of the lower right leg.  (SOF 41)  In addition, Dr. Phillips requested that valium be sent with Plaintiff for the procedure.  (SOF 39)   However, since valium is a Schedule II narcotic, Dr. Phillip's office was advised by Nurse Dennece Ward that the valium could not be sent with Plaintiff.  (SOF 40, 202)  The ultrasound was performed at Audrain Medical Center on September 29, which indicated a small clot just above the right ankle.  (SOF 44, 98)  Plaintiff underwent the ablation procedure on October 1.  (SOF 45)

Plaintiff saw Dr. Phillips for a follow-up appointment on October 8, 2010, and the ablation procedure of the right lesser saphenous vein was scheduled for October 15, 2010.  (SOF 46-47)  However, MDOC's transport team was not able to arrive on time for the appointment and the ablation procedure was rescheduled for November 5.  (SOF 47)

During the time between the ablation procedures, from October 1 to November 5, 2010, Plaintiff reported two events, which he believed were symptoms consistent with a TIAs related to his blood clot that was "moving."  (SOF 63, 74)  The first event occurred on the evening of October 21, when he complained of tingling in his left hand and fingers, and numbness in his face, lasting approximately two minutes.  (SOF 74)  He was seen by Nurse Melanie Powell, who examined him and noted that Plaintiff's facial expressions were equal and was able to move all four extremities spontaneously.  (SOF 74)  Per Nurse Powell's instructions, Plaintiff was seen the following day by Nurse Linda Wiley at sick-call but he denied any problems at that time.

8

(SOF 74-75)  Plaintiff next complained of purported TIA symptoms to Nurse Wiley at sick-call, on November 3, which occurred the previous evening.  Nurse Wiley informed Plaintiff that he was scheduled to see a doctor (Dr. Phillips) on November 5.  (SOF 76)

As scheduled, the second ablation procedure took place on November 5.  (SOF 48)  The valium and numbing gel were sent to Dr. Phillips' office in advance of the procedure.  (SOF 49)  Plaintiff was seen by Dr. Cabrera on December 8 and it was noted that Plaintiff was doing well after the surgeries and Plaintiff voiced no complaints.  (SOF 51)

### IRR 10-1786 Filed by Plaintiff

Plaintiff filed IRR 10-1786 on October 13, 2010, and the subsequent Offender Grievance and Offender Grievance Appeal, complaining that he was denied treatment for a large blood clot and a stroke, and was not given valium and numbing gel for the ablation procedure on October 1, 2010.  (SOF 84-86)  The only individuals named therein were Jill Perkins, Dr. Cabrera, Dr. Conley, Dr. Campbell, and Dr. Roxas.  (SOF 87)

### 2014 Events

The allegations pertaining to events that occurred in 2014 involved treatment of a fractured left ankle, a change in prostate medication, placement in administrative segregation ("ad-seg"), another IRR filed by Plaintiff, and a "late-night" blood pressure check.  (SOF 100, 147, 181, 265)

### Fractured Left Ankle

Plaintiff fractured his left ankle on January 11, 2014 while playing dodgeball and was transported to the emergency room at Hannibal Regional Hospital, where he was diagnosed with an avulsion fracture by Dr. Arham Hussain.  (SOF 101)  Upon discharge from the hospital, Dr. Hussain ordered hydrocodone-acetaminophen (brand name Vicodin) as needed, and to follow up

with Dr. Curtis Burton in five days. (SOF 101)  Upon Plaintiff return to NECC that day, the emergency room papers were given to Nurse Allen, who then provided them to Dr. Kendis Archer, an onsite physician. (SOF 107-09)  Dr. Archer then ordered that Plaintiff receive tramadol, be assigned to a bottom bunk, no work and recreation, and to follow up with Dr. Cabrera in ten days. (SOF 112)

Instead of being seen by Dr. Cabrera ten days later, January 21, Plaintiff was seen by Dr. Archer. (SOF 116-17)  Per Dr. Archer's request, Plaintiff was seen by an outside orthopedic physician, Dr. Timothy Galbraith, on January 29. (SOF 116, 121)  Dr. Galbraith's orders for Plaintiff included a bootcast for the left foot, which Plaintiff received on February 4. (SOF 122, 130)  Plaintiff was seen again by Dr. Archer on March 12, wherein he noted that Plaintiff's ankle had clinically improved, with mild tenderness to palpation and decreased swelling. (SOF 141)  Dr. Archer ordered that Plaintiff be issued a left ankle sleeve, insoles, and a pair of high-topped shoes.  It is indicated in Dr. Archer's entry that Plaintiff was satisfied. (SOF 142-43)

### *Placement of Plaintiff in Ad-Seg*

Gang activity at NECC and other prisons was an issue and was investigated because it impacted the safety and security of staff and offenders. (SOF 212-13, 217)  At the onset of the investigation, those offenders suspected of being involved in criminal behavior would be assigned to ad-seg. (SOF 215)

AIO James Rhodes and CO1 Pamela Elliott met with Offender Brian Haynes on March 15, 2014, at which time Offender Haynes gave them a letter he received from Offender Albert Strutton, who was in ad-seg. (SOF 218-19)  In the letter, Offender Strutton told Offender Haynes that he (Strutton) and another offender were "planning malice and mayhem" after release

10

from ad-seg.  (SOF 220)  During that meeting, AIO Rhodes and CO1 Elliott learned the names of 19 offenders, and it was decided to investigate them for gang-related activities.  (SOF 221)

Plaintiff was one of the 19 offenders named by Offender Haynes.  (SOF 222)  During the meeting, Offender Hayes advised AIO Rhodes and CO1 Elliott that: Plaintiff was "backing up" Offender Strutton "in issues on the yard"; Offender Strutton supplied drugs, marijuana, and K2 to Plaintiff; Plaintiff provided protection for Offender Strutton on the yard and that Plaintiff would kill for Offender Strutton; and Plaintiff "ran [the] hill. (SOF 223)

On March 19, due to several incidents occurring at NECC and other MDOC institutions within the past several months, Warden James Hurley, Deputy Warden Will Jones, and Assistant Warden Scott Griggs met with AIO Rhodes and decided to place Plaintiff and the other offenders in ad-seg pending the investigation for gang-related activities.  (SOF 226)  It was decided to place Plaintiff in ad-seg because he was named as an individual who was involved in some incidents that had gang-related components or involvement.  (SOF 228)

AIO Rhodes directed Lt. Larry Allen (an MDOC employee at NECC and the husband of Nurse Allen) to place Plaintiff in ad-seg.  (SOF 18-19, 229)  Prior to being placed in ad-seg, offenders are taken to Medical for a medical evaluation.  (SOF 233)  Prior to going to ad-seg on March 19, Plaintiff was seen in Medical at 3:45 p.m. for an evaluation conducted by Nurse Debra Baker.  (SOF 334-35)

### *Change in Prostate Medication*

Plaintiff had a history of prostate obstruction and trickling urinary flow for which he had been receiving an alpha blocker, doxazosin, to treat the prostate.  (SOF 148-49)  The doxazosin is a dual-effect medication and was also prescribed to treat Plaintiff's high blood pressure, for which he was also taking in conjunction with atenolol.  (SOF 150)

11

Plaintiff submitted a Health Service Request[5] on July 31, 2014, complaining that his doxazosin had not been renewed and that he had a swollen prostrate. (SOF 154) Dr. Cabrera was advised by a nurse that the doxazosin was not working and he switched Plaintiff to Flomax on August 1. (SOF 155-56) However, Plaintiff complained to Nurse Wiley at nurse sick-call on September 5 that the Flomax was not working and she referred him to doctor sick-call. (SOF 163) Plaintiff was seen by Dr. Glenn Babich on September 20, who then switched Plaintiff back to doxazosin. (SOF 164)

### *"Late-Night" Blood Pressure Check*

Because Plaintiff had a history of high blood pressure and was taking medication for it, it was necessary that his blood pressure be periodically monitored. (SOF 17, 151-52) A medical record entry for November 20[6], 2014 indicates that Nurse Sarah Starks took Plaintiff's blood pressure at 9:15 p.m. (SOF 261)

### *IRR 14-136 Filed by Plaintiff*

Plaintiff filed IRR 14-136 on February 3, 2014, complaining that Nurse Allen refused to provide the emergency room report from Hannibal Regional Hospital to Dr. Archer on January 11, 2014 and that the nursing staff refused to provide him with or locate the bootcast ordered by Dr. Galbraith. (SOF 182-84) The Assistant Director of Nursing, Tammy Anderson, met with Plaintiff on February 28 to discuss his IRR. (SOF 186) Plaintiff acknowledged that he had received his bootcast since submitting the IRR, but then accused Nurse Allen of intentionally delaying medical care because of negative feelings Nurse Allen had towards him for a "situation" that occurred years before at another camp, of which Lt. Allen was aware, and that Nurse Allen was attempting to harm him. (SOF 186-87) In her written Response, Nurse

---

[5] Submitted by offenders requesting to be seen by a medical provider for medical, dental, and mental health issues.
[6] Plaintiff erroneously alleged the date as November 11.

Anderson advised Plaintiff that Nurse Jane Wilkinson, NECC's Director of Nursing, spoke with Nurse Allen and stressed the importance and zero tolerance of withholding or delaying medical care.  (SOF 191)

Plaintiff filed an Offender Grievance to the IRR on April 3, in which he not only complained about Nurse Allen's denial of treatment related to his fractured ankle, but also about events occurring in 2010 when Nurse Allen allegedly refused to: fill Dr. Phillips' prescription for numbing gel and pain medications for the ablation procedure; stop the blood clot in his right calf from moving; and schedule him to see a doctor after he reported the two purported TIAs.  (SOF 195-96)  Nurse Norton reviewed and investigated Plaintiff's Offender Grievance and she and Dr. Cabrera responded that Nurse Allen did not deny or withhold any medical care from him.  (SOF 204)

After receiving the Response to his Offender Grievance, Plaintiff filed an Offender Grievance Appeal on July 28, claiming that, as an attempt by Nurse Allen to justify the delay in and denial of medical treatment, Dr. Archer mentioned to him that Nurse Allen and Lt. Allen told Dr. Archer that Plaintiff was involved in a prison riot at another MDOC prison in 1996.  (SOF 206)  In addition, Plaintiff also claimed that Nurse Norton attempted to cover up Nurse Allen's "post [2010] and present deliberate indifference . . . ."   (SOF 206)  In the Response to his Offender Grievance Appeal, Plaintiff was advised that he received appropriate care and treatment for his medical issues.  (SOF 211)

## Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered against a party "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

13

any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed.R.Civ.P. 56(c). The movant bears the burden of establishing both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp.,* 477 U.S. at 323; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Once the movant has met its burden, the nonmoving party may not rest on the allegations in its pleading alone but must set forth evidence and specific facts showing a genuine issue of material fact exists on each element of its claim. Fed.R.Civ.P. 56(c); *see also Matsushita,* 475 U.S. at 586 (stating the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

## Citation of Authority in Support of Arguments

In actions by prison inmates against prison officials for deliberate indifference under, it must be proven that: the plaintiff suffered from objectively serious medical needs; the defendant knew of the condition; and the defendant deliberately disregarded the complaint. *Kitchen v. Miller*, 343 F.Supp.2d 820, 823 (E.D. Mo. 2004); and *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997). The absence of proof for any one of these three elements is dispositive in an action for deliberate indifference under 42 U.S.C. § 1983. However, as will be seen from the applicable law and arguments that follow, Plaintiff has failed to prove one or more of these elements.

To support a claim of deliberate indifference under 42 U.S.C. Section 1983, "[a] prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995). A medical decision not to order a particular course of treatment or testing does not represent cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97, 107 (1976). Likewise, mere displeasure with a course of medical treatment is not

sufficient to rise to a constitutional violation. *Kitchen v. Miller*, 343 F.Supp.2d at 823. It has been held that prisoners do not have a constitutional right to any particular type of treatment. *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996). In fact, physicians are entitled to exercise their medical judgment when providing care and treatment to inmates. *White v. Farrier*, 849 F.2d 322, 327 (8th Cir. 1988). Particularly, prison physicians do not have to follow the recommendations of outside consultants as they are free to exercise their independent medical judgment in determining the course of treatment to be followed. *Toney v. Hakala*, 2013 WL 5406448, *55 (E.D. Mo. 2013).

"An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *Crowley v. Hedgepeth*, 109 F.3d 500, 502 (8th Cir. 1997). The objective portion of the deliberate indifference standard requires a showing of "verifying medical evidence" that the defendants ignored an acute or escalating situation, or that delays adversely affected the prognosis given the type of injury in this case. *Dulany v. Carnahan*, 132 F.3d 1234, 1243 (8th Cir. 1997).

To establish retaliation under 42. U.S.C. § 1983, Plaintiff must show that (1) he engaged in a protected activity, (2) the defendants took adverse action against him that would chill a person of ordinary means, and (3) the adverse action was motivated at least in part by the exercise of the protected activity. *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004). With respect to the third prong, Plaintiff must demonstrate that the retaliatory motive was a "but-for" cause of the action. *Monroe v. Precythe*, 2020 WL 2322922, *17 (E.D. Mo. 2020). Although the causal connection is generally a jury question, it can provide a basis for summary judgment when the "question is so free from doubt as to justify taking it from the jury." *Revels v. Vincenz*,

15

382 F.3d at 876.  Plaintiff must also show that he was singled out for exercising his constitutional rights.  *Baribeau v. City of Minneapolis*, 596 F.3d 465, 481 (8th Cir. 2010).

Name calling and verbal threats by prison officials, without more, do not invade a federally protected right.  *McDowell v. Jones*, 990 F.2d 433, 434 (8th Cir. 1993).  In fact, even when prison officials harass an inmate in an attempt to dissuade him from filing a grievance, there is no Eighth Amendment violation if the inmate was not denied access to the grievance procedure.  *Harris v. Henneberry*, 2007 WL 4290739, *6 (E.D. Mo. 2007).

When evaluating a motion for injunctive relief, a district court balances four factors: (1) the likelihood of the movant's success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm that the relief would cause to the other litigants; and (4) the public interest.  *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) (citing *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981)).  Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction.  *Watkins Inc. v. Lewis*, 346 at 844 (See *Adam-Mellang v. Apt. Search, Inc.*, 96 F.3d 297, 299 (8th Cir. 1996)).

<u>Argument – Nurse Allen</u>

<u>*Ablation Procedure*</u>

Plaintiff alleges that, in 2010, Nurse Allen was deliberately indifferent to his serious medical needs by failing to send with him the medication for the ablation procedure on October 1 and, as result, he experienced pain and anxiety because he  had to undergo the procedure without any pain medication.  (SOF 31)  Plaintiff was treated for his varicose veins between June 1 and December 8, 2010, during which time Nurse Allen's only medical encounters with him were on

16

June 29 (in the cardiovascular chronic care clinic) and October 14 (for a flu shot, which Plaintiff refused).  (SOF 33, 89)

It must be noted, primarily, that Plaintiff admitted that he only believed that Nurse Allen was responsible for failing to provide the medication because she was his chronic care nurse, but that it was, in fact, Nurse Ward who was responsible.  (SOF 56)  Nonetheless, Nurse Allen did not have any involvement with the ablation procedures because they were not chronic care issues, but rather elective procedures as they were not considered urgent or emergent.  (SOF 54-55, 61)

Plaintiff's claim that he underwent the ablation procedure on October 1 without any pain medication and experienced pain and anxiety belies the fact that: Dr. Phillips' notes indicate that the procedure was performed under local anesthesia; Plaintiff tolerated the procedure well; the treatment was successful; and the total treatment time was two minutes.  (SOF 45-46)  In comparison, the second ablation procedure on November 5 was two minutes and twenty seconds.  (SOF 48)  Valium is not a necessary component for an ablation procedure and the anesthesia used (local anesthetics and tumescent anesthetic solutions) during the October 1 ablation procedure should have more than sufficed to make the procedure tolerable.  (SOF 61-62)  In addition, the ablation procedure on October 1 was *not* "partially" completed because Dr. Phillips recommended *two* procedures, one of the right lesser saphenous vein and the other of the right greater saphenous vein.  (SOF 36, 45, 48)  It is routine treatment for ablation procedures of the two veins to be treated in a staged fashion as two separate settings.  (SOF 61)

Nurse Allen does not recall Plaintiff's ablation procedures, and Plaintiff has not offered any factual proof that she was aware of his ablation procedures and Dr. Phillips' request for the medications.  (SOF 53)  The only evidence that Plaintiff has proffered is his *belief* that Nurse

17

Allen knew of the ablation procedures because she was his chronic care nurse.  This assertion based on nothing more than mere speculation and conjecture.

### *"Life-Threatening" Blood Clot*

Plaintiff alleges that Nurse Allen was deliberately indifferent to his complaint on September 20, 2010 of a "life threatening" blood clot.  (SOF 63)  Although Plaintiff did have a blood clot, it was *not* life-threatening.  (SOF 66-69, 97-98)  Plaintiff does not have any medical training but it was only his *opinion* that the blood clot was life-threatening, nor did he see anything in the medical records indicating that it was life-threatening.  (SOF 90-92)  As noted above, Nurse Hendrix assessed Plaintiff's complaint on September 20 and he was seen and provided treatment by Dr. Cabrera that same day.

Nurse Allen did not recall if Plaintiff had any blood clots.  (SOF 73)  Although Plaintiff claims that he told Nurse Allen about the blood clot sometime between September 2020 and the time of his the surgery on October 1, the only times that Nurse Allen saw Plaintiff was on June 29 and October 14, 2010.  (SOF 93-94)  In fact, Plaintiff had not even made any complaints against Nurse Allen in IRR 10-1786 and his Grievance and Grievance Appeal thereto.  (SOF 88)

Plaintiff has not provided any substantial proof that Nurse Allen was aware of his blood clot.  Even assuming, *in arguendo*, Nurse Allen had been aware of the blood clot, Dr. Cabrera assessed it, did *not* consider it as life-threatening, and provided treatment for it.  It is evident that the blood clot resolved as Plaintiff has not offered any verifying medical evidence of experiencing any sequelae resulting therefrom.

### *Purported TIAs*

A complaint of stroke-like symptoms is an acute issue and not a chronic care issue.  (SOF 80)  In response to Plaintiff's complaints of purported TIAs on October 21 and November 3,

18

2010, he was seen and assessed, as indicated above, by Nurses Powell and Wiley, which was appropriate and within the accepted nursing standard of care. (SOF 74-76, 97, 99)  The only medical encounter Nurse Allen had with Plaintiff between those two dates was on October 14, when she offered him a flu vaccination. (SOF 94)  If Plaintiff had complained to her about any purported TIA's, she would have assessed him and documented it in his medical records and, if necessary, referred him to be seen by a doctor. (SOF 81)  Once again, Plaintiff did not make any complaints against Nurse Allen in IRR 10-1786 and his Grievance and Grievance Appeal thereto. (SOF 87--88)

Plaintiff has not provided any substantial proof that Nurse Allen was aware of any purported TIAs.  And, again, Plaintiff has not offered any verifying medical evidence of having experienced any sequelae resulting from any TIAs.

### *Fractured Ankle*

Nurse Allen was temporarily assigned as the major-room nurse[7] when Plaintiff returned to NECC from Hannibal Regional Hospital for treatment of his fractured ankle on January 11, 2014. (SOF 107-08)  Plaintiff alleges that Nurse Allen failed to provide the emergency room report Dr. Archer upon his request and note that the emergency department recommended Plaintiff to follow up with Dr. Burton in five days. (SOF 100)  He also alleges that: there was nothing in Dr. Archer's order for Plaintiff follow up with Dr. Cabrera or to cancel the follow-up appointment with Dr. Burton; Nurse Allen told Dr. Archer that she would provide the report to Dr. Cabrera, but failed to do so; and, as a result, her failure to provide the report to either Dr. Archer or Dr. Cabrera caused a delay in Plaintiff receiving treatment for his ankle. (SOF 100)

---

[7] Similar to an emergency room nurse.

19

Contrary to Plaintiff's allegations, Nurse Allen *did* provide Dr. Archer with the paperwork upon Plaintiff's return from Hannibal Regional Hospital. (SOF 109)  Dr. Archer had the discretion to implement or not implement the emergency room physician's plan of care. (SOF 111, 115)  Dr. Archer chose to implement a different plan of care, including orders for Plaintiff to follow-up with Dr. Cabrera in ten days, on January 21. (SOF 112)  For some reason, Dr. Cabrera was not available on January 21 and, therefore, Dr. Archer saw Plaintiff on that date and referred Plaintiff for an orthopedic consultation with Dr. Galbraith. (SOF 116-17)  There is no evidence that Nurse Allen interfered with Dr. Archer's plan of care, and her involvement in Plaintiff's care that day was appropriate and within the standard of care. (SOF 114)  The only support that Plaintiff can muster is that the allegations are based upon his "information and belief," which is tantamount to mere speculation and conjecture.  In fact, Plaintiff admitted that that it was up to the "prison doctor" to make the referral for him to see an orthopedic surgeon. (SOF 101)

Plaintiff alleges that Nurse Allen interfered in the delivery of the bootcast ordered by Dr. Galbraith on January 29, 2014 and that he did not receive it until February 4. (SOF 100, 124) Although Plaintiff claims that Dr. Galbraith sent the bootcast "next day express," Plaintiff has not offered any evidence if Dr. Galbraith in fact shipped the bootcast on January 29.  Plaintiff seemingly implies that the bootcast arrived at NECC on January 30, that Nurse Allen knew about it prior to February 4, but that she deliberately withheld it from him.  However, while at NECC's pharmacy on Friday, January 31, he was advised by Nurse Michelle Kelley, who "oversees packages," that she did not have the bootcast. (SOF 138)  Particularly noteworthy is the fact that Nurse Allen did not work the following two days, February 1 and 2. (SOF 138)  Thus,

20

Nurse Allen could not have known if the bootcast was at NECC prior to February 2 and Plaintiff has not provided any evidence that she knew it was there as of February 3.

Nurse Allen was not responsible for tracking and ensuring that offenders receive medical devices shipped to NECC, including Plaintiff's bootcast, and was not aware of the bootcast until February 4 when Plaintiff presented to Medical, asking the sick-call nurse about it. (SOF 126-27, 135-37, ) The sick-call nurse asked Nurse Allen to assist with locating the bootcast, which they located and gave to Plaintiff. (SOF 127-29) Plaintiff has not provided any evidence that Nurse Allen was aware prior to February 4 that a bootcast had been ordered for him. Nonetheless, assuming *in arguendo*, any delay in treatment of Plaintiff's fractured ankle did not hinder it from healing in a timely manner. (SOF 146) Plaintiff has not presented any verifiable medical evidence to the contrary.

### *Prostate Medication*

Plaintiff alleges that Nurse Allen knew the Flomax prescribed by Dr. Cabrera was not working and that she failed to schedule him to see a doctor about his complaint. (SOF 147) Since treatment of a prostate issue is not a chronic care issue, Plaintiff was referred to a doctor sick-call appointment by Nurse Wiley on September 5, 2014. (SOF 163, 169, 171) Nurse Allen would not have scheduled the appointment because she was not assigned as Dr. Cabrera's nurse and he had another nurse assigned to him who scheduled his appointments. (SOF 175-78) As such, Nurse Allen did not have any knowledge about the change in Plaintiff's prostate medications, and Plaintiff even testified that he did not know if Nurse Allen was aware about it. (SOF 179) Plaintiff has not offered any supportive evidence that Nurse Allen was aware of the change in prostate medications and of his purported problems associated with it.

21

### *Conspiracy and Retaliation*

Plaintiff claims that, because of Nurse Allen's alleged deliberate indifference in 2010 pertaining to his ablation procedures, blood clot, and purported TIAs, and her attempt to delay treatment for his fractured ankle in 2014 (by allegedly telling Dr. Archer of Plaintiff's prior involvement in a riot and assault upon staff at another institution in 1996), Nurse Allen received a reprimand and that a notice, to not delay or deny medical care, was placed in her file on or before March 19, 2014.  (SOF 181)  As a result, Plaintiff alleges that Nurse Allen, Lt. Allen, and other MDOC officials conspired to place him in ad-seg on March 19 in retaliation against Plaintiff for filing IRR 14-136 against her.  (SOF 181)

First and foremost, Plaintiff was not placed in ad-seg out of retaliation, but upon well-founded suspicions of his involvement in gang-related activities, as delineated above.  As also mentioned above, there is no evidence showing that Nurse Allen had any involvement pertaining to the 2010 allegations, and that she did not deny or delay Plaintiff any treatment related to his fractured ankle.  In fact, Dr. Archer did not have any recollection of anyone, including Nurse Allen and Lt. Allen, advising him about Plaintiff's prior involvement in the 1996 riot and assaults.  (SOF 206-07)  Lt. Allen did not know that Plaintiff filed an IRR against Nurse Allen, and he and Nurse Allen never discussed any IRRs filed against her because that would be a violation of HIPAA.  (SOF 241-43)  Plaintiff even admitted that he did not know what Nurse Allen's motive was for attempting to "harm" him; and that the riot was "the only thing [he] could think of why [he] wasn't getting the care that everybody else was," and did not know whether Nurse Allen and Lt. Allen talked about it.  (SOF 188, 190)  The fact that Nurse Norton signed the IRR on the same date Plaintiff was placed in ad-seg is nothing more than mere coincidence.  The motivating factor behind Plaintiff's placement in ad-seg was not out of retaliation but it was for

22

investigation of gang-related activities.  He was not singled out for filing a grievance but was one of 19 offenders placed in ad-seg for investigation of gang-related activities.

With respect to the purported "reprimand" and "notice" received by Nurse Allen, any such counseling of this nature would have been placed in her personnel file. (SOF 192)  Nothing about this was placed in her personnel file. (SOF 192)  Rather, Nurse Wilkinson's discussion with Nurse Allen was a matter of policy, regardless of whether the complaint was legitimate or not. (SOF 192)  In fact, Plaintiff testified that, other than being reminded that medical treatment needed to be appropriate, he did not know of anything else that happened to Nurse Allen as a result of his grievances, especially if any reprimand or notice was placed in her personnel file. (SOF 193-94)

Lt.  Allen did not have any involvement with the decision to place Plaintiff in ad-seg, and did not know anything about it until March 19 when he was directed by AIO Rhodes to escort Plaintiff to ad-seg.  (SOF 227, 230-32)  Prior to placement in ad-seg, offenders are taken to Medical for a medical evaluation.  (SOF 233)  Plaintiff alleges that, in an effort to intimidate him, Lt. Allen arranged for Plaintiff to be escorted to Nurse Allen to have his vital signs checked. (SOF 181)  However, it was not Nurse Allen who checked Plaintiff's vital signs and performed the evaluation, but rather it was Nurse Baker.  (SOF 235-36)  Further, Plaintiff was in Medical at 3:45 p.m., at which time Nurse Allen was preparing to go off her shift at 3:55 p.m.  (SOF 234, 237-38)  Nurse Allen was never informed that Plaintiff would be placed in ad-seg and Plaintiff has not offered any evidence that she was aware of this.  (SOF 244)  In fact, Plaintiff admitted that it was only because of Nurse Allen's presence in Medical that he assumed she and Lt. Allen arranged for her to be waiting there for him.  (SOF 239)  Plaintiff did not allege that he was

harmed by Nurse Allen's presence and, if he was intimidated by it, such did not constitute deliberate indifference.

Plaintiff alleges that Nurse Allen scheduled him to have his blood pressure checked in Medical at 9:15 p.m. on November 20, 2014, and for Lt. Allen and other correctional officers to be present there at that time to intimidate Plaintiff as an effort to keep him from filing a lawsuit. (SOF 181, 255-56, 263)  However, Nurse Allen was not responsible for scheduling blood pressure checks because that was the responsibility of the Medical Records Department, with whom she did not have any involvement.  (SOF 262)  Plaintiff's allegation is based on speculation and conjecture and is supported only by Plaintiff's claim that Lt. Allen was purportedly present in Medical at the same time as Plaintiff.  In fact, Plaintiff admitted that neither Lt. Allen nor any of the other correctional officers said anything to Plaintiff, and that he did not hear what they were discussing.  (SOF 258)  If Plaintiff was intimidated by their mere presence, such did not arise to deliberate indifference, especially in light of the fact that this did not hinder him from filing this lawsuit.

### Argument – Nurse Norton

Plaintiff alleges tacit authorization against Nurse Norton.  He claims that he filed "multiple" IRRs between September 2010 and 2014, and that Nurse Norton participated in the reviews and responses of "some" of them.  Therefore, she knew or should have known about Nurse Allen's alleged deliberate indifference to his medical needs.  (SOF 265)  In particular, Plaintiff alleges that Nurse Norton attempted to cover up Nurse Allen's "post [2010] and present deliberate indifference."  (SOF 273)  First, Nurse Norton had no involvement in 2010 with investigating any of the allegations that occurred during that year because she was not assigned to NECC at that time.  (SOF 277)  Second, the only Offender Grievance filed by Plaintiff in

24

which she was involved was related to IRR 14-136. (SOF 267-71, 276, 278-85)  In fact, Plaintiff admitted that the only IRR grievance that Nurse Norton participated in reviewing was the IRR and Offender Grievance against Nurse Allen.  (SOF 288)

Nurse Norton did not attempt to cover up any of Plaintiff's allegations of deliberate indifference against Nurse Allen.  Nurse Norton provided a written response to Plaintiff's Offender Grievance to IRR 14-136, wherein she: reviewed his medical record; found his allegations from 2010 unsubstantiated; found that Nurse Allen followed nursing protocol upon Plaintiff's return from the hospital on January 11, 2014; and concluded that Nurse Allen had not denied or withheld any medical care from Plaintiff.  (SOF 271)  Further, as part of her investigation, she instructed Nurse Allen to provide her with a written response to Plaintiff's complaints against her (Nurse Allen).  (SOF 272)  Based on this, Nurse Norton actively investigated Plaintiff's Offender Grievance and did not attempt to cover up Plaintiff's allegations against Nurse Allen.  Rather, Plaintiff merely disagrees with Nurse Norton's conclusion, which does not constitute deliberate indifference.

## Argument – Dr. Cabrera

### *Treatment of Blood Clot*

Plaintiff alleges that Dr. Cabrera knew Plaintiff had a life-threatening blood clot in 2010 and deliberately denied him proper medical treatment for it.  (SOF 63)  The clot was not life-threatening but rather it was superficial phlebitis and was not "dangerous," and did not require any urgent or emergent medical attention.  (SOF 66, 68, 97)  A good number of such clots resolve spontaneously without any specific therapy.  (SOF 98)  The type of blood clots that "you have to worry about," those that are deep in the veins, are the "ones you don't see."  (SOF 69) Superficial phlebitis is treated with aspirin and bedrest, with which Dr. Cabrera treated Plaintiff.

25

(SOF 64-65, 70-71)  The treatment provided by Dr. Cabrera was appropriate and within the accepted standard of care.  (SOF 97-98)  As noted above, Plaintiff does not have any medical training, and admitted that it was his *opinion* that the clot was life-threatening and did not see anything in the medical records indicating that it was life-threatening.  (SOF 90-92)  Plaintiff has not provided any verifiable medical evidence that the clot was life-threatening and that he suffered any adverse consequences therefrom.  He merely disagreed with Dr. Cabrera's exercise of medical judgment and course of treatment.

### *Change of Prostate Medication*

Plaintiff alleges that Dr. Cabrera changed the prostate medication to Flomax without first consulting Plaintiff, which was in violation of Section 334.100.2(4)(h) RSMo.[8] and thus constituted deliberate indifference.  (SOF 147)  He alleges that the Flomax did not work and, as a result, his prostate became swollen and he experienced difficulty urinating for two months until Dr. Babich switched Plaintiff back to doxazosin.  (SOF 147)  However, since Dr. Cabrera was familiar with Plaintiff's medical history, there was no need for him to see Plaintiff before prescribing it.  (SOF 30, 180)  Doxazosin and Flomax are both in the same class (alpha-blockers), have the same mechanism of action, and were prescribed to Plaintiff in equivalent dosages.  (SOF 180)  Therefore, there was no reason for Dr. Cabrera to suspect that the clinical result would have been any different.  Plaintiff has not presented any evidence that Dr. Cabrera was aware that the Flomax was not working, or any verifiable medical evidence that he suffered any continuing injury.  Dr. Cabrera's medical management of Plaintiff's prostate was within the

---

[8] Section 334.100.2(4)(h) RSMo. provides in part: "2. The board may cause a complaint to be filed with the administrative hearing commission . . . for . . . (4) misconduct, fraud misrepresentation, dishonesty, unethical conduct or unprofessional conduct . . . including . . . (h) . . . prescribing . . . any drug . . . without sufficient examination including failing to establish a valid physician-patient relationship . . . or not in good faith to relieve pain and suffering, or not to cure an ailment, physical infirmity, or disease . . . ."

standard of care. (SOF 180) Plaintiff's allegations do not amount to anything more than a disagreement and displeasure with Dr. Cabrera's medical judgment. Even assuming, *in arguendo*, that the treatment may not have been within the standard of care, it would not constitute deliberate indifference, but mere negligence.

Section 334.100.2(4)(h) RSMo. pertains to administrative investigations and hearings by Missouri's Board of Registration for the Healing Arts pertaining to disciplinary actions against healthcare providers, including the denial, revocation, or suspension of licenses, and does not constitute a private right of action. Even if the statute did permit a private right of action, it would be a state and not a federal action. Plaintiff has not sought to enjoin such action in this lawsuit under supplemental jurisdiction and, therefore, the Court does not have any subject matter jurisdiction over such a claim. Further, Dr. Cabrera's actions did not violate the statute because he knew Plaintiff and was familiar with his medical history and had a valid physician-patient relationship with him. Dr. Cabrera prescribed the Flomax as an endeavor to relieve Plaintiff's discomfort due to a swollen and enlarged prostate.

### Argument – Corizon

### *Unconstitutional Policies*

Plaintiff alleges that Corizon instituted a policy for changing a formulary medication (i.e., doxazosin) for treating a swollen prostate to a "less expensive" nonformulary medication (i.e., Flomax) as a cost-saving measure, and knowing that such would "negatively impact certain patients." (SOF 147) This is not so as Flomax is "ten times more expensive" than doxazosin and, as a nonformulary medication, needs authorization from Corizon's Regional Office before it can be prescribed. (SOF 158) Dr. Cabrera had Plaintiff's best interests in mind when he switched Plaintiff to Flomax, which Dr. Cabrera described as a "real prostate medication

27

compared to doxazosin." (SOF 156)  It logically follows that the change to Flomax was not a cost-saving measure.  Further, the Flomax was discontinued, and Plaintiff was restarted on the doxazosin.

### *Injunctive Relief*

Plaintiff also alleges that he will "suffer irreparable harm unless the Court grants injunctive relief in the form of a preliminary and permanent injunction requiring Defendants to institute a policy that prevents physicians from changing an offender's medications without first meeting with the offender, examining him, discussing the medication options and side effects . . . ." (SOF 147)  First, Plaintiff is no longer incarcerated and, therefore, he will not suffer any irreparable harm.  (SOF 1)  Second, there was no need for Dr. Cabrera to see Plaintiff before prescribing the Flomax because he was familiar with Plaintiff's medical history.  Third, Plaintiff was restarted on the doxazosin.  Not only is Plaintiff's request for injunctive relief moot, but there is also no likelihood that he will succeed on the merits of his case because Dr. Cabrera's treatment did not constitute deliberate indifference.  Therefore, Plaintiff's request for injunctive relief should be denied.

### Conclusion

Based upon the above facts, reasons, and cited authorities, and as more precisely set forth in their Statement of Uncontroverted Material Facts filed simultaneously herewith, Plaintiff has failed to prove that Corizon Defendants were deliberately indifferent to his medical needs.  In particular, Plaintiff has failed to provide any verifiable medical evidence demonstrating that the medical care provided to him was inadequate and that any medical needs that may have been delayed and/or denied resulted in any continuing injuries related thereto.  Therefore, Plaintiff's

cause of action with respect to them, including his request for injunctive relief, should be

summarily dismissed with prejudice.

Respectfully submitted,

*/s/ J. Thaddeus Eckenrode*
J. Thaddeus Eckenrode, Mo Bar #31080
ECKENRODE-MAUPIN, Attorneys at Law
11477 Olde Cabin Road, Suite. 110
St. Louis, MO 63141
(314) 726-6670 (Telephone)
(314) 726-2106 (Fax)
jte@eckenrode-law.com
*Attorney for Corizon Defendants*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing was served via electronic filing on this 5th day of February 2021 to the following:

**Mr. John J. Ammann**
Saint Louis University School of Law
100 N. Tucker Boulevard
St. Louis, MO  63101-1930
*Attorney for Plaintuiff*

**Mr. Zackary G. Smith**
Greensfelder, Hemker & Gale
 10 South Broadway, Suite 2000
St. Louis, MO  63102-1747
*Attorney for Plaintiff*

**Mr. Edward Crites**
Assistant Attorney General of Missouri
Missouri Attorney General's Office
P. O. Box 861
St. Louis, MO  63188
*Attorney for MDOC Defendants*

*/s/ Joan Monninger*